**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

In Re:                                                    Bankruptcy No. 23-30106

Tomas Jon Doll,                                           Chapter 7
Sara Marie Doll,

               Debtors.
_____/

Gene W. Doeling as Bankruptcy Trustee,

               Plaintiff,

               v.                                         Adversary No. 23-07013

Tomas Jon Doll,
Sara Marie Doll,

               Defendants.
_____/

**MEMORANDUM AND ORDER**

## I.      INTRODUCTION

Gene W. Doeling, Chapter 7 Bankruptcy Trustee, filed an Adversary Complaint

seeking denial of Debtors/Defendants Tomas and Sara Doll's discharge under 11

U.S.C. § 727(a)(2), (4) and (6).[1]  The Trustee alleges Debtors transferred property of

the estate prepetition and failed to disclose the transfers. He also claims Debtors made

false oaths in connection with their bankruptcy case by undervaluing assets and failing

to disclose assets and income. Additionally, he alleges Debtors refused to obey a court

order by failing to turn over nonexempt assets.

_____

[1] The Trustee also alleged a claim under section 727(a)(3), but he withdrew this
claim in his pretrial brief.

Debtors filed an Answer to the Complaint, denying they knowingly undervalued their assets or failed to disclose prepetition transfers and assets with intent to hinder, delay or defraud creditors.  They admitted they have not turned over nonexempt assets, explaining that they are in negotiations with the Trustee and plan to pay for all nonexempt property with a single payment.

The Court tried this case on November 4, 2024.  For the following reasons, the Court finds in favor of Debtors.

## II.   BACKGROUND

Debtors Tomas and Sara Doll married in 2009 and have a seven-year-old daughter.  Since graduating from college with a business management degree in 2010, Tomas Doll has been a salesman and businessman.  Sara Doll, who earned a master's degree, has worked as a nurse practitioner for 15 years.  Tomas Doll handles all of Debtors' finances.

### A.   Tomas Doll's Business Ventures

For a few years after college, Tomas Doll worked as a salesman in the oilfield sales and services industry before he began investing in various businesses.  In 2013, Tomas Doll invested $200,000 in exchange for a 31% interest in Volk Investments, a corporation that owned Pita Pit restaurants.  Debtors borrowed money and granted a second mortgage against their home to fund the investment.  Tomas Doll also signed a personal guaranty with Choice Financial.  In addition to Tomas Doll's 31% ownership interest, Jesse Vetter owned 5%, and Chris Volk owned the remainder of Volk Investments.

In 2014, Tomas Doll and Volk formed 114 on 3rd LLC, which purchased a 74-unit apartment building in downtown Bismarck for $2.1 million.  Tomas Doll's parents

provided $600,000 for the purchase, but Tomas Doll and his parents did not formalize any repayment terms.  Capital Credit Union provided financing for a portion of the purchase, and Tomas Doll personally guaranteed the debt to Capital Credit Union. Tomas Doll testified that he pledged Debtors' residence as collateral for this debt.

In 2015, Tomas Doll and Volk formed Capped Out LLC, which owned a hotel in Minot.  American Bank Center (now Bravera Bank) financed Capped Out.

Initially, Tomas Doll and Volk operated the businesses together.  In 2016, Volk assumed operations, Tomas Doll paid Volk to manage the businesses, and Tomas Doll became a silent partner.

Volk petitioned for bankruptcy relief in 2017.  At or about this time, Tomas Doll discovered that Volk embezzled $1.2 million from their businesses, which were partially financed by Capital Credit Union.  According to Tomas Doll, Capital Credit Union demanded that Tomas Doll remove Volk from the businesses.  Tomas Doll assumed responsibility for paying the notes and managing the businesses.

Volk Investments operated until 2020, when Vetter purchased Debtors' interest. According to Tomas Doll, Vetter agreed to make arrangements to remove Tomas Doll's name from the promissory notes related to the debt to Choice Financial but failed to do so.  Choice Financial claimed Debtors still owed it $145,000.  In January 2022, Choice Financial began garnishing Sara Doll's wages because Debtors failed to make payments.

In 2018, Tomas Doll invested $250,000 for an 80% ownership share in Telos Industries, Inc., which developed a "blow-off valve" for use in the oil industry.  Although

Telos is an ongoing entity, it has been mired in patent litigation related to its valve since the company began.

In addition to his businesses with Volk, Tomas Doll also invested in Rash Enterprises and Tech Investments, which are not relevant to this litigation because Tomas Doll's involvement with these businesses ended in 2020.

Sara Doll testified that she was "not really involved" in Tomas Doll's businesses.

### B.    Debtors' Financial Distress

From 2018 to 2020, Tomas Doll made monthly payments toward the debt resulting from his businesses with financial help from his parents.  Tomas Doll estimated that he and his parents collectively invested $1.3 million into the businesses, unsuccessfully trying to keep them operating and to postpone foreclosure.  After the pandemic began, Tomas Doll could no longer make the payments, so he closed the businesses.  Tomas Doll owed Capital Credit Union over $2 million, and it pursued foreclosure of the real property owned by 114 on 3rd.  To Tomas Doll's disappointment and frustration, in 2020, Capital Credit Union accepted a $1.25 million offer to buy the building, which had an appraised value of $5.4 million according to Tomas Doll.

Enforcing its rights under the personal guaranty Tomas Doll signed, Capital Credit Union obtained a judgment in excess of $2.8 million against Tomas Doll and foreclosed on Debtors' home.  Capital Credit Union purchased Debtors' residence at the foreclosure sale.  Prompted by Capital Credit Union's eviction action, Tomas Doll reached an agreement with Capital Credit Union to buy out Capital Credit Union's interest in Debtors' residence for $200,000.  Tomas Doll paid the settlement sum on April 30, 2021.  Ex. 33.  As part of the agreement, and upon advice of Debtors' counsel, Capital Credit Union transferred its interest in the property to Sara Doll.  Sara Doll

4

testified that she did not know about the foreclosure.  At the time of the agreement with
Capital Credit Union, creditors held judgments against Tomas Doll in the approximate
sums of $145,000 (Choice Financial), $500,000 (American Bank Center) and $2.8
million (Capital Credit Union).

Seeking to avoid bankruptcy, Tomas Doll borrowed $25,000 from American
Express to pay creditors in November 2022.  He testified he accumulated approximately
$100,000 in debt on Debtors' personal credit cards trying to pay business debts.  Tomas
Doll's parents also gave him more money during this time to help pay business and
personal expenses.

Ultimately, Debtors ran out of money.  In or around January 2023, Debtors
consulted an attorney about seeking bankruptcy relief.

### C.    Bankruptcy Disclosures

Debtors filed a voluntary petition for relief under Chapter 7 of the Bankruptcy
Code on March 31, 2023.  By signing their petition, Debtors acknowledged that they
read the information on the petition, schedules and statements and testified that it was
true and accurate to the best of their knowledge at the time their attorney filed the
documents.  They also acknowledged that they signed the petition under penalty of
perjury.

The information in Debtors' bankruptcy schedules came from the information
Tomas Doll compiled on a worksheet provided by Debtors' counsel. Sara Doll claims
she provided her wage statements but otherwise assumed no involvement in gathering
information or preparing the documents for Debtors' bankruptcy case.  At trial, Sara Doll
repeatedly asserted that she did not remember looking at specific schedules and was
not familiar with their contents.

The Trustee argues that Debtors undervalued or failed to disclose numerous assets and transfers in their bankruptcy schedules and statements.  Facts pertaining to these assets and transfers follow.

1.    Homestead

Debtors built their residence in 2011, financing it with a $60,000 down payment and a $315,000 loan from Gate City Bank secured by a mortgage.  Debtors granted a second mortgage on their home in 2013 as security for a loan to fund Tomas Doll's investment in Volk Investments.

In 2015, Tomas Doll submitted a personal financial statement to Choice Financial in which he represented that the value of Debtors' residence totaled $885,000.  Ex. 8. He did not obtain an appraisal or other valuation of the property before listing this value. Tomas Doll explained that, at the time, the oil boom in western North Dakota brought money to the area and strengthened the housing market.  He conceded that an appraiser may not agree with this value, but he heard buyers were paying more than appraised values for homes.  He believed that the $885,000 value estimate was accurate at that time because of the strong market and low interest rates.

When Debtors filed for bankruptcy relief eight years later, they listed $612,000 as the value of their residence on their schedules.  Tomas Doll explained that he was not certain of the house's value on the petition date, and the 2022 tax assessed value of $612,000 was the only "tangible" value estimate they had at the time.[2]  Believing it to be

---

[2] Tomas Doll acknowledged that the 2023 tax assessed value of Debtors' house increased to $672,000, but he testified that they did not receive this information until after Debtors filed their petition.

an accurate figure, he listed the tax assessed value on Debtors' schedules.  At the time,

Debtors owed Gate City Bank in excess of $400,000 secured by two mortgages against

the residence. Tomas and Sara Doll both testified that they knew when they filed the

bankruptcy petition that they held nonexempt equity in the residence and anticipated

they would have to pay the bankruptcy estate for this nonexempt equity to keep their

home.

In January 2024, Sara Doll entered an agreement with the Trustee to purchase

Debtors' nonexempt equity in the residence from the bankruptcy estate for $335,000.

Ex. 25.  Tomas Doll testified that he thought the agreement included the purchase of all

of Debtors' nonexempt assets.  During negotiations ultimately resulting in the

agreement, the Trustee informed Debtors he obtained a competitive market analysis of

Debtors' residence in August 2023 in which the author assigned a value of $897,500 to

the residence.  See Ex. 25.  Using this value, there remained approximately $397,226 in

equity in the residence after subtracting the balance of the debt secured by two

mortgages ($225,828 and $174,446[3]) and Debtors' $100,000 homestead exemption.

Debtors did not obtain their own appraisal of the homestead at the time because,

according to Tomas Doll, the Trustee maintained he would not accept anything less

than $335,000.  Asked whether he thought the negotiated $335,000 sum to purchase

---

Debtors' homeowners insurance policy limit is $702,424 for the dwelling, but
there is no evidence Tomas Doll considered this figure when he listed the value of
Debtors' homestead on their bankruptcy schedules.

[3] In their schedules, Debtors listed the sums of $235,218 and $177,860 as the
debt secured by mortgages granted to Gate City Bank. The actual sums they owed to
Gate City on the petition date totaled $225,828 and $174,446, respectively. Doc. 28.  In
his post-trial brief, the Trustee concedes that the sums Debtors listed in the schedules
were accurate as of the date Tomas Doll completed the bankruptcy worksheet.

their nonexempt equity was fair, Tomas Doll answered that Debtors had little choice—they either pay the $335,000 the Trustee demanded or the Trustee would sell their home.

The Trustee hired Joseph Ibach, owner of Dakota Appraisal & Consulting, Ltd., to appraise Debtors' residence for the purposes of this adversary proceeding.  Ibach began appraising property in 1975.  He has prepared thousands of appraisals in his nearly 50 years as an appraiser, and his expertise includes residential, commercial and agricultural property.  He performs appraisals statewide.  In 1988, Ibach achieved the Member Appraisal Institute designation, which Ibach described as the pinnacle of the appraisal field.

Ibach visited Debtors' home on July 19, 2024.  Sara Doll guided Ibach through the home and directed Ibach's attention to issues affecting its value, including water damage in the basement, settling on the back patio and driveway and other smaller issues.  Ibach considered these issues and comparable sales in determining that $775,000 was the home's fair market value as of the petition date, March 31, 2023. See Ex. 2.  He opined that he does not consider tax assessed values, which he claimed are typically less than market values.

2.   Household Goods

According to Tomas Doll, Debtors purchased most of their home furnishings from Zimmerman's Furniture through multiple purchases between 2013 and 2018.  The purchase price of the furniture totaled $20,236.48 including sales tax.  Ex. 10.  With the exception of a dining room table discussed below, Debtors have not purchased any furniture since 2018, but they sold two couches and two chairs.

8

Tomas Doll listed $45,000 as the value of Debtors' household furniture and appliances on the 2015 personal financial statement he provided to Choice Financial. Ex. 8.  He explained that the furnishings and appliances were all fairly new at that time.

On Debtors' bankruptcy schedules, they listed $1,200 as the value of their household goods and furnishings and described them as "4 beds, 2 couches, kids books, NP education books, desk." Ex. 1 at 11.

When asked how he estimated the $1,200 value assigned to Debtors' household goods and furnishings for purposes of their bankruptcy, Tomas Doll answered that he began with the $13,000 purchase price,[4] and he subtracted $3,100 for the two couches and two chairs they sold prepetition.  He divided the remaining sum in half to account for wear and tear.  He also subtracted the $4,126 they still owed to Synchrony Bank for the furniture on the petition date from its value, presumably believing the debt affected its value.  Aside from this explanation, Tomas Doll did not provide specific numbers as he described his mathematical calculation. Using Tomas Doll's numbers, the value of Debtors household goods and furnishings is $824 ($13,000 – 3100 = 9,900 ÷ 2 = 4,950 – 4,126 = $824).

On their schedules, Debtors separately listed electronics ("laptop, 2 ipads (2016), 2 iPhones (2020), 5 Samsung TVs (nothing new)") with a value of $1,000. Ex. 1 at 11.

The Trustee asked Debtors for a more detailed list of their household items than they listed on their schedules.  In response to this request, Tomas Doll walked through their house and compiled a list of 20 items that he referred to as their "big stuff."  See

---

[4] Tomas Doll did not explain why he started with $13,000 as the new value instead of the approximately $20,000 purchase price.

9

Ex. 21.  He explained that "big stuff" meant items worth "some value."  Despite his

suggestion that he listed only "big stuff," Debtors' household items list included property

valued at $0 because the items were "not worth really anything. So, basically destroyed

or ripped, tore, stained."  Tomas Doll determined the values on the list based on the

purchase price minus "wear and tear."  The total value of all the items on this list is

$14,000 and includes a dining room table delivered postpetition worth $4,500.  Id.  It

also includes five televisions with a total value of $500.  Id.  Additionally, Debtors

provided the Trustee a list of furniture they purchased from Zimmerman's Furniture.  Ex.

10.

     The list Tomas Doll prepared for the Trustee includes many items that Debtors

did not list on their schedules, which Tomas Doll explained included just the household

items that occurred to him "off the top of my head."  At trial, Sara Doll also

acknowledged that Debtors owned more household goods on the petition date than

those listed on their schedules.  Debtors owned all the property on the list at the time of

their bankruptcy petition except the dining room table.

     The Trustee hired Dean Moos of North Star Auction & Appraisal to appraise

Debtors' household goods.  Moos has 27 years of experience as a licensed auctioneer

but virtually no formal training or education appraising property.  Although Moos has

prepared 75 appraisals of personal property similar to Debtors' property for estate or

insurance purposes, his expertise in estimating personal property values is primarily

based on his experience conducting approximately 900 auctions of primarily personal

property through estate or business liquidations, including 40 auctions this year.  When

conducting auctions, Moos typically does not generate a list of property and values.

Instead, he walks through a home to "get a sense of what's there—whether it's worthy of an auction or not and be something that we would be interested in."

Moos visited Debtors' home on May 30, 2024, to inspect their personal property. He took photos of Debtors' property that he used to compile a list of property and to assess its fair market value. Moos defined fair market value as the price one could reasonably expect to receive for the items if listed on a website or sold at a well-advertised auction. He also described fair market value as higher than wholesale value but lower than replacement value.

For the appraisal he prepared in this case, Moos used his institutional knowledge of auction values, coupled with online research for specific items, to determine the value of Debtors' property. Moos explained that auction prices can vary "a lot" and that the values he assigned reflect average values considering the condition of the items.

Moos described Debtors' personal property as "typical" for the area. Although Moos will auction household goods if a seller also has vehicles, guns, tools and/or collectibles, Moos explained that household goods are a "harder sell" at auction and few auctioneers sell them because they are not a "money maker." In fact, during his inspection of Debtors' property, Moos told Tomas Doll that he would not accept Debtors' personal property for auction because Debtors did not own any "bigger ticket" items, their household goods would be hard to sell, and they would not generate a big return.

Moos opined that the fair market value of Debtors' household goods totaled $13,580. His comprehensive list of over 125 items or groups of items included children's books ($50), stuffed animals ($20), painted magazine rack ($10), decorative floor vase ($10), pair of very worn vinyl chairs ($10) and used bedding and bath linens

($200). Ex. 3. His market value estimate also included the dining room table purchased postpetition valued at $750. Id. Additionally, his estimate included electronics such as televisions and computers valued at $970, golf clubs valued at $240, and a gun safe valued at $850. Id. Although he testified he researched the value of the safe, he did not include the dimensions, capacity or fire safety rating of the safe in his report. Moos declined to describe the condition of the property except for a few items on the list. Moos explained that any item without a specified condition was in average condition.

Sara Doll confirmed that the list of Debtors' property Moos prepared was mostly accurate, but she specifically disagreed with Moos' description of an area rug. Tomas Doll did not quibble with the accuracy of the items listed, but he opined that "nobody would probably buy it," claiming, "I wouldn't even buy my furniture" for the value Moos suggested.

### 3.    Dining Room Table

Months before filing their bankruptcy petition, Debtors purchased a special order dining room table. Debtors selected "a slab" for the table in December 2022. The table craftsman, Levi Wetzel, called Tomas Doll on March 31, 2023, the petition date, demanding payment for labor to continue constructing the table. Tomas Doll transferred $2,000 to Wetzel through Venmo on March 31, 2023, and an additional $2,540 on April 13, 2023. Ex. 16. Debtors took possession of the table in mid-April. Debtors did not disclose the $2,000 payment in their schedules. Tomas Doll explained he did not consider the table an asset as of the petition date because Wetzel did not finish and deliver it until after the petition date.

4.    Various Accounts

a.    Thrivent

Sara Doll's parents established a Thrivent mutual fund account in her name when she was a minor.  Although Sara Doll held the Thrivent account on the petition date, Debtors did not disclose it on their bankruptcy schedules.  Tomas Doll explained that they forgot about the account because Debtors did not receive an account statement in 2022.  Sara Doll further explained that she does not deposit in or withdraw from the account or "do anything" with the account, which is why she forgot about it. Debtors' 2021 tax return included dividend and capital gains from the Thrivent account. Ex. 18.  As of the petition date, the account balance totaled $5,192.93.  Ex. 4.

b.    Venmo

Debtors failed to disclose a Venmo account Tomas Doll held on the petition date. Tomas Doll explained that he only uses the account to make payments and typically does not hold any cash value in it.  He believed the account held no money on the petition date.  The parties stipulated that the Venmo account balance totaled $134.77 on the petition date.  Doc. 28.

c.    Bitcoin

Debtors did not disclose a Bitcoin account Tomas Doll held with a balance of $7.37 on the petition date.  Id.  According to Tomas Doll, Debtors did not list it on their schedules because he believed it only contained $0.06.  He last used the account in November 2021, and he never withdrew any money from the account.

13

### d.    My Forex Funds

On two different dates in late January 2023, Tomas Doll transferred $979 to My Forex Funds, a business that offered access to trading capital, if Tomas Doll passed the requisite phases. Ex. 7.  He explained that the purchases were for a "challenge" from My Forex Funds that allowed him to "take" two trading "phases."  According to Tomas Doll, if he passed both phases, My Forex Funds agreed to fund an account with $100,000 for him to use to trade.  If he did not pass the phases, he lost the $979. Tomas Doll purchased a total of four challenges in the six months before the bankruptcy petition.  Id.  He paid $1,389 each for two other phases with the hope that My Forex Funds would grant him access to a $200,000 account.  The purchases were money paid to "play th[e] game," but Tomas Doll clarified that he never held money in an account that he could access, and he never withdrew any money from My Forex Funds accounts.  According to Tomas Doll, the Securities and Exchange Commission enjoined My Forex Funds from operating before Debtors filed for bankruptcy relief.  My Forex Funds never sent statements showing sums paid, earned or invested.  Users could access that information while My Forex Funds operated, but this access is no longer available, according to Tomas Doll.  At trial, Sara Doll claimed she knew nothing about My Forex Funds.

### e.    Acorns

Tomas Doll also held an Acorns account tied to his debit card with $0.08 in it on the petition date that Debtors did not disclose on their bankruptcy schedules.  Doc. 28. With each debit card purchase, the cents necessary to round the purchase to the nearest dollar were deposited in the Acorns account and invested.  Tomas Doll testified

that he had not used the account in "forever" or at least in the two years prior to the bankruptcy petition.

        5.    <u>Audio Equipment</u>

In July 2022, Debtors purchased a stereo system from Blue Hawk Audio and Video. Debtors' credit card statements reflect a $5,722.79 payment to Blue Hawk on September 12, 2022. Ex. 12. Tomas Doll explained that he purchased the stereo for his parents' pontoon, and they reimbursed him for the purchase before Debtors' petition date. Debtors did not disclose this transaction in their bankruptcy schedules.

        6.    <u>Telos</u>

On Debtors' schedules, they valued Tomas Doll's interest in Telos as $0. On Debtors' 2021 tax return, they valued the stock basis of their interest in Telos at $31,134. Ex. 18. Debtors' 2022 tax return lists $1,175 in income from Telos, and Form 8995 of their return shows total qualified business income from Telos totaling $8,663. Ex. 19. Their Shareholder's Basis Worksheet indicates a stock and loan basis at the end of 2022 of $39,797. <u>Id.</u> Tomas Doll explained that he did not consider the values included in the tax return when valuing his interest in the company at $0 on Debtors' bankruptcy schedules because the company is not operating and is still in litigation. He testified that he has never received a check from Telos or any documentation showing its value or profit and loss. He maintained that he has never received any money from Telos because Telos uses income it generates to pay the attorneys representing Telos in the patent litigation. Telos does not own property other than its interest in a patent.

7.    <u>Other Property</u>

Debtors valued their jewelry on their bankruptcy schedules at $2,000 and described it as "Engagement Ring (last valued in 2008)."  According to Tomas Doll, he used the 2008 purchase price as the value of Sara Doll's ring on the bankruptcy schedules.  Sara Doll testified that she owns a wedding ring in addition to the engagement ring, and the set is missing diamonds.  According to Debtors' homeowners insurance policy, the coverage limit for the diamond engagement ring is $12,300 and the coverage limit for the wedding ring is $3,700, for a total of $16,000 in coverage.  The parties stipulated that the "appraised value of Debtors' jewelry on their insurance policy was $12,300."  Doc. 28.

On Debtors' bankruptcy petition, they listed golf clubs with a $300 value.  On October 8, 2022, Tomas Doll spent $255.24 on a golf club, but he sold it because it "didn't work."  On February 2, 2023, Tomas Doll bought another club for $278.82.  He claimed the second club "didn't work either or maybe I just don't golf well," so he sold it as well. He sold both clubs before Debtors filed for bankruptcy relief.  When asked whether $300 was a fair value for the golf clubs he owned on the petition date, he claimed the sum was too high because he was offered only $118 for his clubs at Golf Etc.

At the time Debtors filed for bankruptcy, they owned a gun safe but did not list it on their schedules.  Tomas Doll claimed that his failure to list the gun safe was an oversight.  He listed the gun safe at a value of $250 on the more detailed list of household goods Debtors provided upon the Trustee's request.  Ex. 21.

16

8.    Other Disclosure Issues

Prior to filing their bankruptcy petition, Sara Doll booked and paid for a postpetition work convention in the Bahamas.  Sara Doll's employer reimbursed Debtors for the expenses through direct deposit transferred postpetition.  Debtors did not disclose the prepetition travel payment on their schedules or Statement of Financial Affairs.

Tomas Doll periodically engages in online sports betting.  He was unable to recall precisely how much he lost on sports betting in the year before the petition, but he approximated the losses at $300.  Debtors failed to disclose these losses in their Statement of Financial Affairs.  In response to the Trustee's question about failing to disclose these gambling losses, Tomas Doll explained, "Yes, but again, I didn't know $50 mattered.  You recall I have three million on my head."

On March 14, 2023, a couple weeks prepetition, Tomas Doll deposited a check from his parents for $6,500.  Ex. 30.  He could not recall why his parents issued the check to him, but he explained that he regularly buys parts, equipment and supplies for his parents' farm and his parents reimburse him.  Debtors did not disclose the payment from Tomas Doll's parents on their schedules, but they claim that the $6,500 was a gift that they were not required to disclose in their Answer to the Complaint.  Tomas Doll testified that as of the petition date, his parents did not owe him any money.

Debtors made a payment in the sum of $1,155.86 to Gate City Bank on an unsecured loan prior to the petition date.  Gate City Bank returned this payment to Debtors on April 3, 2023, a few days after they filed their bankruptcy petition.  The

parties stipulated that this returned payment was an asset of the bankruptcy estate and that Debtors have not turned these funds over to the Trustee.  Doc. 28.

On the petition date, Tomas Doll possessed two checks Debtors did not disclose on their bankruptcy schedules.  Doc. 28.  Empower issued a check for $1,768 dated March 13, 2023, and Tomas Dolls' parents issued the other check dated March 29, 2023, for $230.  An annotation on the memo line read: "Farm Phone/Reimburse," and Tomas Doll explained that his parents reimburse him monthly for the phone bill.  Ex. 31. Tomas Doll offered no explanation for failing to disclose the checks as assets, but he denied intentionally waiting to cash the checks until after the petition date.  He testified that he routinely waits until he has a few checks and then deposits them together.

Tomas Doll's parents also issued a $7,500 check to him on April 3, 2023, a few days postpetition.  His parents left the memo line blank, and Tomas Doll could not recall why his parents issued him the check.  As with the prepetition check, Tomas Doll explained that his parents regularly reimburse him for purchases he makes for them for farm supplies.  Tomas Doll's father, Terrance Doll, similarly testified that he reimburses Tomas Doll "quite often" for running errands and buying supplies for him.

Apart from the reimbursement payments, Tomas Doll estimated that his parents contributed approximately $1.3 million toward his business and personal expenses. Terrance Doll had no idea how much money he and his wife have given Debtors, but he believed it was less than $1 million.  Tomas Doll repaid only a portion of the money his parents gave him over the years.  Debtors both testified, however, that the money Tomas Doll's parents gave them was never considered a debt.  Both Debtors and Terrance Doll testified that Tomas Doll's parents have never asked for repayment.

Terrance Doll explained, in the most general terms, that the money he and his wife gave Debtors was an investment in Tomas Doll's businesses, gifts or loans.  He provided no specificity or details regarding these transactions or his intent related to them.  He testified that he "probably assumed" and "figured" Debtors would pay them back "when [Debtors] got on their feet."  Tomas Doll and his parents did not execute any loan documents or contracts, keep an accounting or discuss repayment terms related to any of the money Tomas Doll's parents gave him.

### D.   Order for Turnover

On October 4, 2023, the Trustee brought a motion seeking turnover of certain nonexempt assets, account statements and keys and control of Debtors' residence. The Court granted the motion on October 19, 2023, and ordered Debtors to turn over the items the Trustee requested, including "nonexempt cash assets totaling $3,153.86 to the extent these funds still exist."  Ex. 32.  The Trustee conceded that Debtors mostly complied with the Order, except for turnover of the $3,153.86 in nonexempt cash assets.

Tomas Doll testified that Debtors have not turned over any cash to the Trustee because he thought the $335,000 they paid the Trustee in February or March 2024 pursuant to a negotiated agreement for the purchase of estate assets included all of Debtors' nonexempt assets.  He maintained the settlement sum "was supposed to be for all unexempt assets and equity."  Later, Tomas Doll learned that the Sale Agreement only referenced the purchase of equity in Debtors' home.  Since learning that Debtors still owed the Trustee for nonexempt assets, he has been awaiting a global resolution of

the total sum due to the Trustee for nonexempt assets.[5]  He testified that he is willing

and able to pay the Trustee for the nonexempt assets claiming, "Why wouldn't I pay

$3,100 when I paid $335,000."  <u>See also</u> Doc. 4 at ¶ 22.

## III.   CONCLUSIONS OF LAW

### A.    Jurisdiction

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  The

Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and authority to enter a final

order in this matter.  This opinion constitutes findings of fact and conclusions of law in

accordance with Federal Rule of Bankruptcy Procedure 7052.

### B.    Denial of Discharge Standards

In the Amended Complaint, the Trustee seeks a denial of Debtors' discharge

under 11 U.S.C. § 727(a)(2), (4) and (6).  Section 727 of the Bankruptcy Code provides,

in relevant part, that the court shall grant a debtor a discharge unless:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer
> of the estate charged with custody of property under [the Bankruptcy Code],
> has transferred, removed, destroyed, mutilated, or concealed, or has
> permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
>> (A) property of the debtor, within one year before the date of the filing
>> of the petition;
>
> * * *
>
> (4) the debtor knowingly and fraudulently, in or in connection with the
> case—
>
>> (A) made a false oath or account;
>
> * * *

---

[5] Although there was no testimony at trial about tax refunds, the parties stipulated
that Debtors have not turned over the bankruptcy estate's share of their 2023 tax refund
totaling $6,004.33. Doc. 28.

(6) the debtor has refused, in the case—

> (A) to obey any lawful order of the court, other than an order to
> respond to a material question or to testify[.]

11 U.S.C. § 727(a).  Denying a debtor a discharge is a harsh remedy.  Home Serv. Oil

Co. v. Cecil (In re Cecil), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015).  Therefore, courts

construe section 727 strictly in favor of the debtor.  Id.  Even so, a discharge in

bankruptcy and the associated fresh start are privileges, not rights.  Bauer v. Iannacone

(In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing Grogan v. Garner, 498

U.S. 279, 286 (1991)).  "The opportunity for a completely unencumbered new beginning

is limited to the honest but unfortunate debtor."  Id.  The cost to the debtor for an

unencumbered fresh start is minimal, but it includes honestly and accurately disclosing

his or her financial affairs and cooperating with the trustee.  Id.; see also 11 U.S.C.

§ 521 (listing a debtor's duties in bankruptcy).  "To prevail in an action to deny a

debtor's discharge, the objecting party must prove each element under § 727 by a

preponderance of the evidence."  Kaler v. Charles (In re Charles), 474 B.R. 680, 683–

84 (B.A.P. 8th Cir. 2012) (citing Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514

(B.A.P. 8th Cir. 2011)).

### C.    11 U.S.C. § 727(a)(4)

Section 727(a)(4)(A) bars the entry of discharge if a debtor knowingly and

fraudulently made a false oath in connection with a case.  11 U.S.C. § 727(a)(4)(A).  To

meet his burden under this subsection, the Trustee must prove by a preponderance of

the evidence that "(1) the Debtor made a statement under oath; (2) the statement was

false; (3) the Debtor knew the statement was false; (4) the Debtor made the statement

21

with fraudulent intent; and (5) the statement related materially to the Debtor's bankruptcy case." In re Cecil, 542 B.R. at 451 (citing In re Charles, 474 B.R. at 684).

Section 727(a)(4)(A) "requires nothing less than a full and complete disclosure of any and all apparent interests of any kind.  The debtor's petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts."  Id. at 453–54 (quoting Korte v. IRS (In re Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001)).  "The debtor's duty of disclosure requires updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions."  In re Bauer, 298 B.R. at 357.

"Full disclosure is required, not only to ensure that creditors receive everything they are entitled to receive under the Bankruptcy Code, but also to give the bankruptcy system credibility and make it function properly and smoothly[.]" In re Cecil, 542 B.R. at 454.  In other words, the disclosure requirement has implications beyond the administration of each individual bankruptcy case because "failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole."  In re Korte, 262 B.R. at 474 (quoting Nat'l Am. Ins. Co. v. Guajardo (In re Guajardo), 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997) (internal quotations omitted)). As the Bankruptcy Appellate Panel recognized:

> Bankruptcy provides debtors with a great benefit: the discharge of debts. The price a debtor must pay for that benefit is honesty and candor.  If a debtor does not provide an honest and accurate accounting of assets to the court and creditors, the debtor should not receive a discharge.

In re Cecil, 542 B.R. at 454.

1.    <u>Statement Under Oath</u>

A debtor's signatures on the bankruptcy petition, schedules and statements, made under penalty of perjury, are declarations which have the force and effect of "oaths" of the kind contemplated by section 727(a)(4)(A).  <u>In re Charles</u>, 474 B.R. at 684.

Debtors signed their bankruptcy petition, schedules and statements under penalty of perjury.  They acknowledged these signatures at trial.  The Trustee satisfied his burden of proving the first element of section 727(a)(4)(A).

2.    <u>Materiality</u>

A statement is material under section 727(a)(4)(A) if it relates to or concerns the debtor's business transactions, the debtor's business or personal estate, the discovery of assets or the existence or disposition of the debtor's property.  <u>Mertz v. Rott</u>, 955 F.2d 596, 598 (8th Cir. 1992); <u>Georgen-Running v. Grimlie</u> (<u>In re Grimlie</u>), 439 B.R. 710, 717 (B.A.P. 8th Cir. 2010).  Debtors' representations, omissions and the estimated values they included in their schedules and statements relate to their business or personal estate.  The Trustee met his burden of proving materiality.

3.    <u>False Statement that Debtor Knew was False and Made with Fraudulent Intent</u>

The Trustee argues Debtors knowingly and fraudulently made numerous false oaths and accounts by undervaluing their home, a business, household goods and jewelry and failing to disclose assets and transfers, including prepaid travel expenses, a furniture payment, a Thrivent investment account, uncashed checks and accounts. He further asserts Debtors failed to disclose income received and transfers of funds on their schedules and statements.

"The term 'knowingly' requires that the debtor acted deliberately and consciously." CNR Holdings, LLC v. Coffey (In re Coffey), 647 B.R. 365, 400 (Bankr. E.D. Ark. 2022) (qouting Dantzler v. Zulpo (In re Zulpo), 592 B.R. 231, 253 (Bankr. E.D. Ark. 2018)).  "Careless or reckless acts committed by the debtor do not satisfy the knowledge requirement of § 727(a)(4)(A)." Id.

Unlike the knowledge element, when determining whether a debtor's actions were fraudulent, "statements made with reckless indifference to the truth are regarded as intentionally false." In re Korte, 262 B.R. at 474 (quoting Golden Star Tire, Inc. v. Smith (In re Smith), 161 B.R. 989, 992 (Bankr. E.D. Ark. 1993)).  "While courts are often understanding of a single omission or error resulting from an innocent mistake, multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth which is the functional equivalent of intent to deceive." Horizon Fin. Bank v. Borstad (In re Borstad), 550 B.R. 803, 833 (Bankr. D.N.D. 2016).  The Trustee may establish the requisite fraudulent subjective intent with direct or circumstantial evidence. See In re Cecil, 542 B.R. at 451; Casamatta v. Holden (In re Holden), 542 B.R. 455, 459 (Bankr. W.D. Mo. 2015).  "[D]etermination[s] concerning fraudulent intent depend[ ] largely upon an assessment of the credibility and demeanor of the debtor[.]" In re Coffey, 647 B.R. at 400 (alterations in original).

At trial, the Trustee offered evidence suggesting that Debtors undervalued their residence, household goods, jewelry and Tomas Doll's interest in Telos.  As an overarching principle applicable to each alleged undervaluation in this case, valuation is not an exact science.  "A debtor's opinion as to the value of an asset, based on

estimates, cannot be expected to be right on the mark." Behnke v. Murphy (In re

Murphy), 2007 WL 634081, at *6 (Bankr. C.D. Ill. Feb. 27, 2007). Further,

> Undervaluation alone is seldom considered to be a false oath for
> purposes of Section 727(a)(4)(A) where the asset has been properly
> scheduled by the debtor. In re Scott, 233 B.R. 32 (Bankr. N.D.N.Y. 1998);
> see also In re Zimmerman, 320 B.R. 800 (Bankr. M.D. Pa. 2005). When an
> asset has been properly disclosed, the trustee and the creditors can make
> their own independent determination of its value. In re Blum, 41 B.R. 816
> (Bankr. S.D. Fla. 1984).

Id.; Kramer v. Poland (In re Poland), 222 B.R. 374, 380 (Bankr. M.D. Fla. 1998) ("A

debtor's estimation [of the value of property for purposes of the bankruptcy schedules]

is often far from exact, and is more often than not, based on estimates, not tangible

facts.").

This case, more than many others, illustrates the challenges involved with

estimating the value of property.  Value estimates for Debtors' residence mentioned at

trial include:  $612,000 (2022 tax statement); $672,000 (2023 tax statement); $702,424

(homeowners insurance policy limit for Debtors' dwelling); $775,000 (Ibach appraisal as

of March 2023); $885,000 (Debtors' estimate on a 2015 financial statement); $897,500

(competitive market analysis from some unknown person that served as the basis for

Debtors' equity purchase).  While the estimate Debtors listed in their schedules is the

lowest, this estimate is tied to a legitimate third-party source, and Tomas Doll credibly

testified that he believed the figure was accurate based on his personal understanding

of the market. [6]  In the context of this case, the $897,500 value estimate on which the

---

[6] See Kaler v. Charles (In re Charles), 2012 WL 486524, at *14 n.15 (Bankr.
D.N.D. Feb. 14, 2012) (noting that the tax assessed value of a house may be used as
an indicator of market value in the context of a section 727(a)(4)); In re Gillis, 2024 WL
4434551, at *7 (Bankr. D.S.C. Oct. 4, 2024) (in the context of confirmation of a chapter
13 plan, the court gave more weight to the county tax assessment and debtor's opinion

home equity Sale Agreement was based is less credible than the figure Debtors used in

their schedules.[7]  Given that Debtors properly disclosed the real property, provided a

legitimate basis for their value estimate, cooperated with the Trustee in his efforts to

secure a market valuation and appraisal, and willingly paid the bankruptcy estate for

nonexempt equity, the Court is not persuaded that the Trustee met his burden of

proving that Debtors knowingly undervalued their residence with intent to defraud

creditors.

Likewise, the Trustee failed to meet his burden of showing that Debtors

undervalued jewelry with intent to defraud creditors.  Debtors described Sara Doll's

engagement ring on their schedules as "Engagement Ring (Last valued in 2008)" and

listed $2,000 as the value based on the 2008 purchase price.  According to Debtors'

---

as to value than competing appraisals); Snyder v. Kohout (In re Kohout), 2021 WL
3195811, at *10 (Bankr. D. Minn. July 28, 2021) (finding debtors' use of their
homestead's tax assessed value on petition and schedules was reasonable where
repairs were necessary to support a higher market analysis valuation); Houghton v.
Marcella (In re Marcella), 2009 WL 3348251, at *12–13 (Bankr. D. Mass. Oct. 15, 2009)
(in a case where debtors used the tax assessed value as a price estimate of their house
on Schedule A, the bankruptcy court found debtors' estimate of fair market value
reasonable and persuasive where a subsequent higher appraisal valuation did not
discount for improvements made to the home postpetition; In re Murphy, 2007 WL
634081, at *6 (finding debtors' estimate of the value of their home based on its tax
assessed value and the selling prices of neighboring houses to have a reasonable
basis).

[7] In his trial brief, Trustee argues that "it is apparent that the Debtors knew that
their property had a value well in excess of $612,000," because they agreed to pay the
bankruptcy estate $335,000 for the nonexempt equity in their residence when their
schedules reflected only $98,922 in equity. Tomas Doll explained that Debtors agreed
to pay the estate $335,000 for their nonexempt equity because they had little choice.
They understood that they must either pay the sum the Trustee demanded or he would
sell their home.  Given this context and the perceived imbalance in bargaining power,
the Court is not convinced that the Sale Agreement shows Debtors knowingly
undervalued their residence with intent to defraud creditors or the Trustee.

homeowners insurance policy, the coverage limit for the diamond engagement right is $12,300 and the coverage limit for the wedding ring is $3,700 for a total of $16,000 in coverage.  Debtors maintained this insurance coverage even though diamonds were missing from the set.

The Court finds the "engagement ring" description sufficient disclosure to put the Trustee and creditors on notice of the ring set and the date of the valuation.  Debtors credibly testified about the basis for their valuation, and the Court received no evidence suggesting Debtors considered the insurance policy coverage limits when they completed their schedules or that Debtors believed $16,000 was an accurate market value estimate of the ring set on the petition date.  The evidence received is insufficient to show Debtors knowingly undervalued their jewelry with intent to deceive creditors or the Trustee.

The Trustee also asserts that Debtors undervalued Tomas Doll's interest in Telos by attributing a zero-dollar value to it on their schedules.  Debtors valued the stock basis of this interest at $31,134 on their 2021 tax return, which increased to $39,797 at the end of 2022 according to their Shareholder's Basis Worksheet.  They listed $1,175 in income from Telos on their 2022 tax return and disclosed qualified business income from Telos totaling $8,663 on the Form 8995 attached to their 2022 tax return.  Tomas Doll explained that he did not consider the figures included in the tax returns when valuing his interest in the business at $0 because Telos is not operating and is still in litigation. He testified that he has never received a check from Telos or any documentation showing its value or profit and loss.  He maintained that he has never received any money from Telos because Telos uses the income it generates to pay the

attorneys representing Telos in the patent litigation.  The Court finds Debtors' value

assessment credible.  Given the modest income reported, Tomas Doll's testimony and

the proper disclosure of this asset on Debtors' bankruptcy schedules, the evidence is

insufficient to show Debtors knowingly undervalued Telos with intent to defraud

creditors.

Debtors' failure to accurately list their household goods presents a closer

question.  On their bankruptcy schedules, Debtors listed $1,200 as the value of their

household goods and furnishings and described them as "4 beds, 2 couches, kids

books, NP education books, desk."  Debtors concede that this list is incomplete and

undervalued.

When asked about this disclosure, Tomas Doll explained that he just included the

household items that occurred to him "off the top of my head."  Sara Doll assumed no

responsibility for or involvement in completing the schedules.  Debtors offered no

excuses regarding the urgency of filing or competing work or personal priorities.

Rather, Debtors approach to this question shows inattention and carelessness.   The

same holds true for the value Debtors attributed to their household goods.  Tomas Doll's

explanation for the $1,200 estimate at trial leaves the Court with the impression that he

gave no real thought to the question.

During or after the Meeting of Creditors, the Trustee asked Debtors for a more

detailed list of their household items.   In response to this request, Tomas Doll compiled

a list of 20 items that included "big stuff" that might be worth "some value."  Debtors also

provided a list of furniture they purchased from Zimmerman's Furniture.  Ex. 10.

Debtors' lists are not nearly as comprehensive as the list of over 125 items or groups of

items prepared by Moos from North Star Auction, who included all Debtors' household

possessions—even items unlikely to garner cash for the bankruptcy estate such as

used stuffed animals ($20), painted magazine rack ($10), pair of very worn vinyl chairs

($10) and used bedding and bath linens ($200).  Although they excluded items they

believed were worth little or no value to buyers, Debtors' estimated property value of

$14,000 is similar to Moos's estimate of $13,580.

Despite their admission that the household items disclosure on their schedules is

incomplete and undervalued, Debtors failed to amend their schedules.  Likewise,

Debtors failed to amend their schedules and statements to disclose several assets or

transactions, which they neglected to include in these documents:

- $2,000 payment on the petition date to a contractor who built a custom table,
- Thrivent account with a balance of $5,192.93,
- Venmo account with a balance of $134.77,
- Bitcoin account with a balance of $7.37,
- Acorns account with a balance of $0.08,
- Transfers to My Forex Funds,[8]
- Prepetition travel payment related to a business trip for which Sara Doll expected postpetition reimbursement,
- Approximately $300 in gambling losses,
- $1,155.86 postpetition check issued by Gate City Bank, and
- $1,768 prepetition check issued by Empower.

As this Court has repeated on numerous occasions, Debtors have a duty to

disclose all their assets and to amend their schedules as soon as they learn of an

omission, even if they believe the assets are worthless and even if they provided

updated information to the Trustee or discovered that he knew about the assets or

transfers.  See, e.g., Doeling v. Berger (In re Berger), 497 B.R. 47, 56 n.20 (Bankr.

---

[8] The Trustee did not explain where or why these transfers must be disclosed.

D.N.D. 2013); <u>Doeling v. Trieloff</u> (<u>In re Trieloff</u>), 2012 WL 3201786, at *10 n.13 (Bankr.

D.N.D. Aug. 2, 2012); <u>In re Charles</u>, 2012 WL 486524, at *14 n.15.  Failing to amend

schedules after becoming aware of their inaccuracy is additional indicia of a debtor's

reckless indifference to the truth.  <u>See</u> <u>Kaler v. Danduran</u> (<u>In re Danduran</u>), 2011 WL

3664436, at *13 (Bankr. D.N.D. Aug. 19, 2011).  Conversely, a prompt disclosure and

amendment serves as some evidence of innocent intent.  <u>See</u> <u>Nicholson v. Spearman</u>

(<u>In re Spearman</u>), 2020 WL 6876840, at *8 (Bankr. D. Md. June 18, 2020).

 In his trial briefs, the Trustee appropriately highlighted the number of undisclosed

assets because, without more, "multiple inaccuracies or falsehoods may rise to the level

of reckless indifference to the truth which is the functional equivalent of intent to

deceive."  <u>Horizon Fin. Bank v. Borstad</u> (<u>In re Borstad</u>), 550 B.R. 803, 833 (Bankr.

D.N.D. 2016).  Even with the numerous omissions and Debtors' arguably stubborn

refusal to amend their schedules, the Court is left with the impression that Debtors did

not omit assets or undervalue assets with intent to deceive creditors.  Instead, trial

testimony suggests Debtors did not appreciate the duties and demands imposed by the

Bankruptcy Code.  As Tomas Doll explained in response to the Trustee's question

about disclosing gambling losses, "Yes, but again, I didn't know $50 mattered.  You

recall I have three million on my head."  Yet, Debtors understood the Trustee's duty to

investigate their financial assets and maximize recovery for the benefit of their creditors,

and they repeatedly testified about and demonstrated their willingness to pay the estate

for their nonexempt interest in the assets they wanted to retain.  This conduct is

consistent with Debtors' prepetition efforts to pay creditors, even when it became

apparent that several of Tomas Doll's businesses were destined for failure.  The Court

is not convinced Debtors intentionally hid assets, misled the Trustee or minimized values to preserve a few thousand dollars when they agreed to pay $335,000 for equity in their home while believing this asset was worth substantially less than this sum.  In other words, the Court finds that Debtors' incomplete disclosures resulted from carelessness, inadvertence and lack of attention to detail rather than fraudulent intent to deceive creditors or mislead the Trustee.  Their conduct, while inconsistent with the Court's expectations, does not warrant denial of discharge under section 727(a)(4).[9]

In support of his section 727(a)(4) cause of action, the Trustee also raises concerns regarding Debtors' transactions with, transfers to and from and/or gifts from Tomas Doll's parents.  Specifically, the Trustee maintains that Debtors failed to properly disclose purchases for Tomas Doll's parents and payments to and from his parents before and after they filed their bankruptcy petition, including a $5,722.79 prepetition payment to Blue Hawk Audio for the purchase of stereo equipment for Tomas Doll's parents' pontoon, for which he was reimbursed prepetition; a $6,500 prepetition deposit from Tomas Doll's parents; $230 prepetiton check from Tomas Doll's parents for farm phone reimbursement; and a postpetition check for $7,500, which Tomas Doll assumed his parents issued for expense reimbursement.

---

[9] See Carto v. Oakley (In re Oakley), 503 B.R. 407, 426–27 (Bankr. E.D. Pa. 2013) ("[A] court may take into account the demeanor of the debtor, when the latter is testifying at trial, in assessing whether those errors and omissions stemmed from 'reckless indifference' or were inadvertent, honest mistakes."), aff'd, 530 B.R. 251 (E.D. Pa. 2015); Clippard v. Jarrett (In re Jarrett), 417 B.R. 896, 901 (Bankr. W.D. Tenn. 2009) (stating that "there are many circumstances where a debtor's acts and omissions may have been inadvertent or otherwise excusable" under section 727(a)); Lorance Contracting Co. v. Mead (In re Woodlands Inv. Assocs.), 95 B.R. 681, 682 (Bankr. W.D. Mo. 1988) (circumstances that may support a debtor's stated lack of intent to deceive related to omitted disclosures include that omitted property is "of a type which does not easily come to mind when one initially surveys his or her readily disposable property.")

Although Debtors make no excuse or arguments regarding their failure to disclose these transactions and assets in their trial briefs, Tomas Doll's and Terrance Doll's testimony suggests that Debtors did not view their purchases for Tomas Doll's parents and the related reimbursement as assets or transfers they must disclose. Both men testified that Tomas Doll routinely purchased parts, equipment and farm supplies for his parents. Tomas Doll also pays his parents' telephone bill. Tomas Doll's parents reimburse him for these expenses. Tomas Doll's parents also loaned or gifted him money when needed to pay personal expenses or appease creditors. They maintained this course of conduct for years. At trial, Tomas Doll offered no excuse or explanation for failing to list the checks from his parents as assets or accounts receivable on Debtors' schedules, but he claimed that he did not purposefully wait until after filing Debtors' petition to deposit the checks. Given the course of conduct between Debtors and Tomas Doll's parents and Tomas Doll's credible testimony, the Court finds no intent to deceive Debtors' creditors or the Trustee. To the contrary, it appears that the money Debtors received from Tomas Doll's parents was often used to pay creditors.

While Debtors' failure to list all of their assets constitute false statements made under oath that related materially to the bankruptcy case, the Trustee failed to demonstrate that the evidence, considered as a whole, establishes that Debtors omitted or undervalued assets—whether considered alone or in the aggregate—knowingly and fraudulently or with such reckless disregard for the truth that fraudulent intent is clearly indicated. His claim and cause of action under section 727(a)(4) is dismissed.

### D.    11 U.S.C. § 727(a)(2)(A)

To prevail under section 727(a)(2)(A), the Trustee must prove: (1) Debtors' act or actions took place within one year before the petition date; (2) the act was that of

Debtors; (3) Debtors transferred, removed, destroyed, mutilated or concealed property;

and (4) Debtors took these acts with an intent to hinder, delay or defraud a creditor or

the Trustee.  See Georgen-Running v. Grimlie (In re Grimlie), 439 B.R. 710, 716 n.11

(B.A.P. 8th Cir. 2010); Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 (Bankr. D.N.D.

2008).

Because Debtors did not admit fraudulent intent, the Trustee invites the Court to

rely on the badges of fraud to infer intent. See Ritchie Cap. Mgmt. v. Stoebner, 779 F.3d

857, 861 (8th Cir. 2015); Stoebner v. Ritchie Cap. Mgmt. (In re Polaroid Corp.), 472

B.R. 22, 55–56 (Bankr. D. Minn. 2012); Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810

(Bankr. D.N.D. 2008).  The Eighth Circuit Court of Appeals has looked to the "badges of

fraud" in determining actual intent "regardless of whether the intent language came from

a state fraudulent transfer statute or applicable bankruptcy law." Ritchie, 779 F.3d at

861 (citation omitted). Under North Dakota law, the "badges of fraud" or factors include:

a. The transfer or obligation was to an insider;
b. The debtor retained possession or control of the property transferred after the transfer;
c. The transfer or obligation was disclosed or concealed;
d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
e. The transfer was of substantially all the debtor's assets;
f. The debtor absconded;
g. The debtor removed or concealed assets;
h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and
k. The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

N.D.C.C. § 13-02.1-04. This list is similar to those cited in bankruptcy cases. See, e.g., Doeling v. O'Neill (In re O'Neill), 550 B.R. 482, 500 (Bankr. D.N.D. 2016); Helena Chem. Co. v. Richmond (In re Richmond), 429 B.R. 263, 305 (Bankr. E.D. Ark. 2010); In re Huynh, 392 B.R. at 810. These lists are not exhaustive, and courts are free to consider "any factors they deem relevant to the issue of fraudulent intent." Ritchie, 779 F.3d at 863 (quoting Jensen v. Dietz (In re Sholdan), 217 F.3d 1006, 1009−10 (8th Cir. 2000)) (applying the factors in the context of a fraudulent transfer action under section 548(a)(1)(A))[10]; Dunker v. Bachman (In re Bachman), 2017 WL 3098093, at *4 (Bankr. D. Neb. July 20, 2017).

The presence of a single badge is typically not sufficient to establish actual fraudulent intent. Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1354 (8th Cir. 1995). The confluence of several badges, however, creates a presumption of fraudulent intent. Ritchie, 779 F.3d at 861–62; Kelly v. Armstrong, 141 F.3d 799, 802 (8th Cir. 1998); Dantzler v. Zulpo (In re Zulpo), 592 B.R. 231, 247 (Bankr. E.D. Ark. 2018); see also Rademacher v. Rademacher (In re Rademacher), 549 B.R. 889, 894

---

[10] Recognizing the nearly identical wording of Code sections 522(o), 548(a)(1)(A) and 727(a), the Eighth Circuit Court of Appeals and numerous bankruptcy courts apply the same standard of "intent to hinder, delay or defraud" a creditor to cases under these sections. See Addison v. Seaver (In re Addison), 540 F.3d 805, 811–12 (8th Cir. 2008); In re Sholdan, 218 B.R. 475, 481 (Bankr. D. Minn.1998) ("The Eighth Circuit has approved the use of the same inferential process in applying the statutory language 'with intent to hinder, delay or defraud creditors,' wherever that language is found—in state fraudulent-transfer statutes, 11 U.S.C. § 548(a), or 11 U.S.C. § 727(a)(2)"), aff'd 217 F.3d 1006 (8th Cir. 2000). This standard includes the badges of fraud analysis. In re Addison, 540 F.3d at 811–12; Dantzler v. Zulpo (In re Zulpo), 592 B.R. 231, 247 (Bankr. E.D. Ark. 2018) ("Courts have applied the inferential 'badges of fraud' approach to determine whether a debtor acted with fraudulent intent, regardless of which of these provisions is being construed.").

(Bankr. E.D. Mo. 2016) (noting that the presence of more than one badge of fraud "strongly indicates that the debtor did, in fact, possess the requisite intent").

The Trustee argues that, within a year before the date of Debtors' bankruptcy petition, Debtors concealed assets with the intent to hinder, delay or defraud a creditor or officer of the estate.  He highlights the following badges of fraud and claims they show Debtors' intent to hinder, delay or defraud creditors and the Trustee:  the existence or cumulative effect of a pattern or series of transactions or course of conduct after the pendency or threat of suit, the general chronology of events and transactions, secrecy of conveyance, and Debtors concealing assets.  Doc. 38 at 7.  More specifically, the Trustee asserts Debtors transferred funds to Wetzel and prepaid travel expenses that they failed to disclose.  The Trustee also argues that Debtors undervalued their residence and failed to disclose the Thrivent account, uncashed checks, a gun safe and numerous other household goods.  He maintains this conduct constitutes intentional and continuous concealment.  Doc. 38 at 6.  In other words, the Trustee claims Debtors actively attempted to "put these assets beyond the reach of the trustee," and asserts that "[h]ad the trustee not located them independently, these items would never have been disclosed in the bankruptcy and the Debtors would have kept possession of them unjustly."  Doc. 38 at 7.

Similar to his cause of action under section 727(a)(4), the focus of the Trustee's section 727(a)(2)(A) cause of action is Debtors' failure to properly disclose assets and transfers.  For all the reasons discussed above, the Court is not convinced Debtors intentionally hid assets, misled the Trustee or minimized values to hide or preserve assets from creditors or the Trustee.  In other words, the Court finds that Debtors'

incomplete disclosures resulted from carelessness, inadvertence and lack of attention to detail rather than fraudulent intent to deceive creditors or mislead the Trustee. Their conduct, while inconsistent with the Court's expectations, does not warrant denial of discharge under section 727(a)(2)(A). See Montedonico v. Beckham (In re Beckham), 421 B.R. 602 (B.A.P. 6th Cir. 2009) (in a case involving allegedly concealed assets and a cause of action under section 727(a)(2), the court stated that "a debtor is entitled to discharge if false information is the result of mistake or inadvertence"); Clippard v. Jarrett (In re Jarrett), 417 B.R. 896, 901 (Bankr. W.D. Tenn. 2009) (stating that "there are many circumstances where a debtor's acts and omissions may have been inadvertent or otherwise excusable" under section 727(a)); Massachusetss v. Bartel (In re Bartel), 2009 WL 2461727, at *6 (Bankr. D. Mass. Aug. 10, 2009) (ignorant or inadvertent omissions are not indicative of fraudulent intent); Lorance Contracting Co. v. Mead (In re Woodlands. Inv. Assocs.), 95 B.R. 681, 682 (Bankr. W.D. Mo. 1988) (circumstances that may support a debtor's stated lack of intent to deceive related to omitted disclosures include that omitted property is "of a type which does not easily come to mind when one initially surveys his or her readily disposable property").

The Trustee failed to meet his burden of showing Debtors transferred or concealed property with intent to defraud creditors or the Trustee. His section 727(a)(2)(A) cause of action is dismissed.

### E.      11 U.S.C. § 727(a)(6)

Section 727(a)(6) requires the Trustee prove that "the debtor has refused . . . to obey any lawful order of the court." 11 U.S.C. § 727(a)(6)(A). To deny the debtor's discharge, "the Court must find that the Debtors' lack of compliance with the relevant court order was willful and intentional." Missouri ex rel. Nixon v. Allen (In re Foster), 335

B.R. 709, 716 (Bankr. W.D. Mo. 2006).  To meet his initial burden, the Trustee need only show "the debtor received the order in question and failed to comply with its terms." CNR Holdings, LLC v. Coffey (In re Coffey), 647 B.R. 365, 393 (Bankr. E.D. Ark. 2022). "Although the burden of production shifts to the debtor to explain noncompliance, the ultimate burden of persuasion remains on the Plaintiff . . . [who] must 'demonstrate some degree of volition or willfulness on the part of the Debtor.'" Bustos v. Muller (In re Muller), 2016 WL 3034754, at *9 (Bankr. D.N.M. May 19, 2016) (quoting Pereira v. Gardner (In re Gardner), 384 B.R. 654, 663 (Bankr. S.D.N.Y. 2008)).  In other words, the mere failure to comply with a court order alone is insufficient to warrant the denial of discharge.  Fokkena v. Luttig (In re Luttig), 2004 WL 5852686, at *4 (Bankr. S.D. Iowa Sept. 8, 2004). Instead, the Trustee must show that Debtors "refused" to obey the order for turnover to deny discharge under section 727(a)(6). See id.

In analyzing a claim under section 727(a)(6), some courts consider:  "(1) the detriment to the proceedings versus the harm to the debtor; (2) the intent behind the acts such as whether they were willful or there was a justifiable excuse; (3) the injury to the creditors; (4) and whether the debtor could make amends."  Cadles of Grassy Meadows II, L.L.C. v. St. Clair (In re St. Clair), 533 B.R. 31, 45 (Bankr. E.D.N.Y. 2015), aff'd sub nom. St. Clair v. Cadles of Grassy Meadows II, L.L.C., 550 B.R. 655 (E.D.N.Y. 2016); see also Stapleton v. Klika (In re Klika), 2007 WL 842073, at *2 (Bankr. D. Del. Mar. 16, 2007).

Whether a violation of a court order warrants a denial of discharge is a matter within the bankruptcy court's discretion. Szanto v. U.S. Tr. (In re Szanto), 2021 WL 1329435, at *5 (B.A.P. 9th Cir. Apr. 1, 2021); Cournoyer v. Schamens (In re

Schamens), 2024 WL 5320064, at *10 (Bankr. M.D.N.C. Dec. 13, 2024); In re Luttig,

2004 WL 5852686, at *4. In exercising its discretion to deny a debtor's discharge, "the

bankruptcy court must balance the policy in favor of liberally applying the Bankruptcy

Code to grant discharge to the honest debtor against the policy of denying relief to

debtors who intentionally engage in dishonest practices and violate the Bankruptcy

Code."  Sylvan Learning, Inc. v. Rich (In re Rich), 2013 WL 49809, at *1 (Bankr. D. Neb.

Jan. 3, 2013).

The Trustee asserts Debtors failed to obey the Court's Order for Turnover dated

October 19, 2023.  While conceding that Debtors mostly complied with the Order, he

argues that Debtors refused to turn over $3,153.86 in nonexempt cash assets. Although

the evidence shows that Debtors received the order for turnover, Tomas Doll explained

that he originally thought the negotiated agreement for the purchase of Debtors' home

equity included nonexempt assets.  He also credibly testified that Debtors did not turn

over the nonexempt cash after he learned about his mistaken interpretation because

they are waiting for a "global" agreement that includes the total sum due to the

bankruptcy estate for all the remaining nonexempt assets.  Tomas Doll represented that

Debtors are willing and able to pay the Trustee for nonexempt assets, including the

$3,153.86 in cash assets addressed by the Order.  The Trustee offered no evidence to

the contrary.

While the Court may exercise its discretion to dismiss the 727(a)(6) cause of

action based on a failure of proof, the Court also recognizes that Debtors could have

avoided trial of this cause of action entirely had they simply paid the $3,153.86 in

advance of trial or during the time allowed for post-trial briefing rather than insisting on a

global settlement.  This stubborn demand for a global settlement suggests a willful refusal to obey the Court's Order.  But the circumstances outlined at trial also suggest that harm to Debtors resulting from denial of their discharge for failure to turn over the cash is unduly harsh, Debtors offered an excuse, there appears to be no injury to creditors resulting from a turnover delay, and there is an opportunity for Debtors to make amends.  These factors weigh in favor of Debtors.  Accordingly, the Trustee's claim and cause of action under section 727(a)(6) is dismissed.

## IV.    CONCLUSION

For the reasons stated above, the Trustee's claims and causes of action under 11 U.S.C. § 727(a)(2)(A), (3), (4) and (6) are dismissed with prejudice.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Signed: February 25, 2025.

Entered:  February 28, 2025.

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT